**SCHICK DRY SHAVER, Inc., et al. v. DICTOGRAPH PRODUCTS CO., Inc.**

**No. 257.**

Circuit Court of Appeals, Second Circuit.

April 12, 1937.

AUGUSTUS N. HAND, Circuit Judge, dissenting in part.

———◆———

Oscar W. Jeffery, Abraham Tulin, Reginald Hicks, and Cooper, Kerr & Dunham, all of New York City, for plaintiffs-appellants.

Hoguet, Neary & Campbell, of New York City (John F. Neary and Walter H. Free, both of New York City, of counsel), for defendant-appellant.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiffs are the exclusive licensee and the owner of the patents in suit who stand as one in respect to the issues and will be so treated herein.

The patents sued on are Nos. 1,721,530 and 1,757,978 issued on July 23, 1929, and May 13, 1930, respectively, on applications filed by Jacob Schick on March 21, 1928, and April 23, 1928. The first mentioned is for a shaving implement and the second, which is an improvement patent, is for a shaving machine. Claims 1 and 13 of No. 1,721,530 and claim 5 of No. 1,757,-978 are relied on. As there is no dispute which turns on dates particularly, since the prior art proved is all admittedly old with respect to both patents, they may for convenience be discussed as one; the designation of the claims by number being sufficient to preserve all necessary distinction between the two patents. The second relates merely to the shape of the cutter bar to be used in the shaving implement of the first patent.

When Mr. Schick made his invention in 1929, there seems to have been no dry

shaver which was a commercial success. Some had been patented in this country which attempted to make use of revolving power driven cutters within cylinders provided with slots through which the hair to be cut came into contact with revolving blades either spiral or straight in form. Examples are found in the patent of March 19, 1907, No. 847,609 issued to Roux, and Brunnaci's patent No. 911,472 of February 2, 1909. But these and some others which need not be otherwise mentioned have so little in common with Schick that they may be laid aside without further comment. Not so, however, with a British patent No. 753 issued to Appleyard in 1914, of which more will be said later, as it served to circumscribe the field of invention open to Schick.

Mr. Schick well stated the object of his invention at the beginning of his specifications as follows: "This invention relates to an improved shaving implement that has a shear plate that rests against the face and has a cutter operating under the plate to cut the hairs. The machine can be used for shaving without the use of lather.

"The invention comprises an implement in which the shearing takes place practically on the surface of the skin as the shearing plate or its equivalent is extremely thin. The thin plate is held in place against flexing and collapsing under inward pressure by the cutter which is disposed inside the shearing plate to co-operate with it in shearing and to support it against flexing." And he further said that: "The device is constructed to present a shear plate for movement along the skin, which plate has slots with both ends open. This form therefore provides a plate with no defined front or back but which can be moved back and forth across the skin and can therefore rest close to the skin and the hairs that are still uncut and in the slots do not raise the device out of close contact with the skin. This allows a very close shave to be accomplished. The inside cutter that operates across these slots and transverse relative to the direction of movement of the machine cuts across the edges of the slots to sever the hair, the slots being close together to form a series of narrow teeth which are prevented from moving inwardly by the support given by the inside cutter, which cutter has its teeth arranged on the end as differentiated from prior cutting devices in which the moveable cutters have the

teeth operating alongside the shear plate." So it will be noticed that Schick in his specifications emphasized a very thin shear plate having slots extending from side to side, making each side so alike that the plate had "no defined front or back," which plate served throughout its width as one side of the shearing means in co-operation with a cutter bar inside that not only completed the cutting means but also supported the thin shear plate to prevent flexing. And he pointed out expressly that this construction differed from the prior art in that the cutter "has its teeth arranged on the end" instead of "operating alongside the shear plate." It would, as will be seen, have been a bit more accurate to have said that Schick's cutting means would operate not only throughout the length of the slots on the end but also at the two edges of the shear plate or, as Schick said, "alongside the shear plate," but that is relatively unimportant.

The movement of the cutter bar inside is very rapid. It is actuated by electricity through a suitable device carried in the handle, and the cutter bar is kept tightly against the inside of the shear plate by set screws, though in the commercial form Schick's cutter bar is so spring-held. The approved method of use is to move the shear plate back and forth across the surface to be shaved in directions parallel to the slots in what has been called a "scrubbing action." What hairs enter the slots at the ends will be at once clipped off because of the rapid reciprocating motion of the cutter bar and what enter along the slots will likewise be so cut. Soon after it appeared on the market, Schick's shaving implement came to be commonly known as an electric dry shaver, and, both because of its inherent worth and intelligent sales methods, went into widespread use, despite sales resistance due to a comparatively high price, its radical departure from the common razor method of shaving, and the severe economic depression which soon followed its appearance.

The only prior art which has been called to our attention that is worthy of serious consideration is the Appleyard patent previously mentioned. Therein is found described and illustrated by drawings an electric dry shaver which operated on the same shear plate and reciprocating cutter bar principle used by Schick. That is in fact an adaptation of the old principle used in hair clippers. Appleyard provided a shear plate at one end of his de-

vice which had either a smooth or grooved surface to move back and forth against the skin and on both edges of the shear plate he placed a row of teeth which tapered down to thinness at their outer ends. These teeth were so spaced that hair would enter between them but that space was too small to permit the entry of skin. The reciprocating member was roughly in the shape of an inverted square staple with the width of sides and head prolonged to the length of the shear plate. The ends of the sides which bore against the shear plate at its edges were fitted with teeth that extended outwardly to the ends of the shear-plate teeth, giving the cutting head somewhat the appearance of the well-known Gillette safety razor. The teeth on the moveable double-edged cutter were also tapered to end in thinness. What is called a comb was also provided to extend along each cutting edge outwardly from the ends of the shear-plate teeth to provide added safety in operation and doubtless to aid in directing the hair to be cut into the spaces between the cutting teeth.

It has been argued that Appleyard completely anticipates Schick, even to the slots in the shear plate, in that Schick in that respect merely made Appleyard's grooves deep enough to go through the entire thickness of the plate but that ignores Schick's change to the combination of end with edge cutting that the slots made possible. The advantage of grooves in the Appleyard shear plate was twofold. They would serve to reduce dragging as the plate was moved over the skin and also somewhat prevent the uncut hair from holding the shaver too far away to give a close shave since some of the uncut hair at least would enter the groove spaces. It is true that Schick's slots served that purpose also, yet that but states no more than that there are interesting features common to both.

We are not now concerned with how much Schick took from Appleyard except in so far as that helps determine whether Schick disclosed and covered in the claims in the suit something patentable either by itself or in combination with what was old. The importance of Appleyard's patent in this connection lies only in the fact that it embodies for present purposes everything material that was old. Though there is, and of course could be, no question here concerning what may be called infringement by Schick in this country of Appleyard's British patent and on the contrary only the issue as to what Schick invented in view of Appleyard, what Judge Denison said about patentable difference in Herman v. Youngstown Car Mfg. Co. (C.C.A.) 191 F. 579, 585, is very apt: "Patentable difference does not of itself tend to negative infringement. It may just as well be based upon infringement, plus improvement; and improvement may lie in addition, simplification, or variance." So it is enough on validity if Schick, regardless of how much he may have taken from Appleyard, made one or more patentable improvements which he disclosed and covered in his claims in suit. We think he did just that at least in (1) providing the shear plate throughout of extreme thinness; having (2) slots extending all the way across from edge to edge; and (3) a cutter bar supporting the shear plate, throughout its entire width, against flexing. Much has been said to the effect that the so-called support against flexing would inevitably be provided by a cutter bar held closely enough to the inside of the shear plate to cut the hair successfully in cooperation with the slots in the plate and this is obviously true, provided the cutter was made, as it might be and as Schick made it, heavy enough and well enough supported so as not to flex with the shear plate. And further if it had, as Schick gave it, teeth wider than the slots so that in all stages of movement some part of some cutter tooth would support some part of each strip in the shear head between the slots. To give such a cutter both hair-cutting ability and shear-plate support there was needed only sufficient endwise movement of the cutter to open and close the slots to permit the introduction of hair beyond the inner surface of the shear head despite the fact that the cutter teeth were wider than the shear head slots. And that is what Schick did. The claims relied on are:

"1. A shaving implement comprising a shearing plate of extreme thinness to rest against the skin, having an opening for the reception of hair, a cutter to travel across the opening to provide a shear cut with one side of the opening, and means for holding the parts to insure the supporting of the plate against flexing by means of the cutter."

"13. A shaving implement comprising a shear-plate with slots extending from side to side, a cutter under the plate and having teeth to co-operate with the edges

of the slots in cutting, and means for operating the cutter transversely of the slots."

■ Claim 1 calls for extreme thinness in the shear plate without otherwise defining more definitely the degree of thinness. But that is not fatal. The claim is to be read in connection with the disclosure of the specifications and given of permissible meanings the one which will fairly and reasonably be supported both by the language used and by the scope of the actual invention disclosed. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Keystone Mfg. Co. v. Adams, 151 U.S. 139, 14 S.Ct. 295, 38 L.Ed. 103. So this claim is to be read to mean thinness of shear plate sufficient to provide the desired closeness of shave and the support from flexing to whatever extent such thinness requires.

It will be noticed that the claim calls for but one slot in the shear plate, and this necessarily raises some doubt as to whether this form of Schick's device is useful, and so patentable even if new, but the evidence does not show anything decisive as to that and otherwise the doubt must give way to the prima facie validity of the claim which follows from its allowance in the Patent Office.

Claim 13 was allowable over Appleyard in that it was tied to "a shear plate with slots extending from side to side" of the plate. This was the new feature that brought about end cutting that was wholly absent in Appleyard. And so we hold both claims valid.

But as validity of these claims is dependent upon the rather slight amount of their departure from what Appleyard disclosed so must infringement be proved, if proved at all, within such narrow limits.

The defendant's device is known as the Packard Lektro Shaver. It differs from the Schick Dry Shaver as described in the shape of the shear plate and cutter. Instead of a shear plate of extreme thinness throughout with narrow slots extending from side to side, the Packard shaver has as its shear plate one side of a cylinder having one comparatively large slot running nearly from end to end, making an opening along most of the central portion of that part of the shear plate which comes in contact with the surface to be shaved. The walls of the cylinder are made to taper down to thin edges on either side of the slot and those edges are cut into finely spaced teeth; the spaces being large enough to admit hair but small enough to exclude the skin. Within this cylinder is another of like shape slotted and toothed. It is made to travel rapidly back and forth by electrical means installed in the handle, and because it bears in its toothed portion tightly against the teeth of the shear plate the hairs entering the spaces between the teeth are cut off as the shear plate is moved over the surface to be shaved. It will now be more readily seen that the construction and operation of the Packard shaver is so like that of the Schick that infringement depends upon the breadth to be given Schick's claims in suit in view of Appleyard and we think it as readily seen that the Packard device, instead of being based on Schick, is nothing but an ingenious adaptation of Appleyard. Indeed, it is hardly more than the result of turning Appleyard's cutting edges in upon themselves so that they face each other across the endwise slot. Any added difference in the cutting means, with which we are alone concerned on this appeal, lies in the change from the flat shear plate of Appleyard to the curved side of a cylinder. And obviously the latter difference brings the defendant's shaver no nearer to Schick. By having Appleyard's cutting edges face in toward, and but a short distance away from, each other, the need for what Appleyard called the comb has been eliminated, since each cutting edge serves as a guard for the other. Though the change from Appleyard has been mainly in the location of the cutting edges, the old construction certainly has been greatly improved. And as certainly that has been done in a way quite different from the improvements Schick made over Appleyard. Schick relied on his uniformly extremely thin shear plate with slots extending all the way from one edge to the other and advanced over Appleyard in those respects. The defendant has no uniformly thin shear plate and after what Appleyard disclosed, the shear plate teeth, each row separated from the other by the space called the endwise slot, as of necessity they must be separated in some way to retain the form and perform the functions of the old toothed edges of Appleyard, cannot be said to form slots extending from side to side in a shear plate. Physically they do not do so; in remaining teeth they could not do so; and in effect from the standpoint of infringement they have not done so. A holding that the slotted shear plate of Schick's claim 13 was but the equivalent of

cutting edges of tapering teeth would leave that anticipated by Appleyard and by the same token the lack of such distinguishing slots stands between the defendant's shaver and infringement of that claim. It has but used the old toothed edges located, to be sure, in the end instead of along the outer sides of the cutting head but otherwise essentially the tapered tooth cutting means disclosed by Appleyard which both on the question of validity and on that of infringement must be contrasted with the thin slotted shear plate of Schick. Because the defendant has not invaded the field of improvement occupied by Schick, we find no infringement of either of the claims in suit.

Claim 5 of the second patent in suit relates to the form of the cutter bar. As disclosed in the first patent in suit, Schick's cutter was truly a toothed bar. The spaces between the teeth formed recesses into which the cut hair fell and openings were provided for its escape. They were to be supplemented by means for cleaning, one suggestion in that respect being a suction pump. But in the application for the second patent in suit, which was filed about a month after the first, Schick made his solid cutter bar hollow. This permitted the cut hair to drop into the opening formed by the cutter bar shell whose ends were open providing a way for much of the hair to drop out while the shaver was being used and also a way for cleaning out any that might be left simply by blowing through the opening.

Claim 5 is as follows:

"5. A shaving machine comprising a shaving head channel-shaped in cross section and slotted and sharpened on its closed side to form shearing edges, a cutter channel shaped in cross-section and slotted on its closed side and slidable in the head whereby the slotted ends co-operate to cut hair entering the slots of the shaving head."

This claim as originally filed called for a U-shaped shear plate and a U-shaped cutter. It was rejected by the Examiner on the ground that "The cutter disclosed by the applicant is channel-shaped in cross section and not U-shaped, as specified, in claim 5." The applicant acquiesced and substituted the present claim 5 in suit to meet the objection made. That definitely limits the scope of the claim. The plaintiff cannot now treat its channel-shaped construction as the equivalent of a U-

shaped one. Keystone Driller Co. v. Northwest Engineering Corporation, 294 U.S. 42, 46, 55 S.Ct. 262, 264, 79 L.Ed. 747. Having made that concession to shape—though we do not imply that Schick gave up anything in that regard to which he was entitled in view of the shape of Appleyard's cutter—the patentee cannot, nor can any one else in that right, treat as an equivalent of the channel-shaped construction of the claim something which is no nearer to it than a U-shaped construction would be. Certainly the cylindrical shape used by the defendant is no nearer and for that reason does not infringe.

Decree modified.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

The majority opinion holds that claims 1 and 13 of United States patent No. 1,-721,530 to Schick are valid but not infringed by defendant's Packard razor, and bases this conclusion on limitations of the claims imposed because of the British Patent No. 753 (1913) to Appleyard. With this I cannot agree.

It is true that Appleyard, like Schick, shows a movable cutter which is to be reciprocated in an endwise direction, but the cutting mechanism of Appleyard is along two edges of the plate as in the ordinary Gillette Safety Razor, and Appleyard had to employ combs on each side in order to protect the skin of the user from abrasion. This was because the teeth of the reciprocating cutter were on the outside of the plate rather than underneath it as in Schick. The transverse slots shown in one of Appleyard's diagrams are not in a shearer plate that is to act in connection with the reciprocating plate as a cutter but are plainly inserted only as a means of bringing the razor closer to the face. In the sense of Schick it is not a shearer plate at all.

The question is whether what the majority opinion terms a turning of "edges in upon themselves so that they face across the endwise slot" involved only a skillful adaptation of Appleyard's ideas or was essentially an appropriation of Schick's invention. In view of the fact that nothing close to either the Schick or the defendant's Packard razor is shown in the prior art and that the suggested turning of Appleyard's cutting edges toward one another is far from obvious but involves a complete reorganization of Apple-

yard's device, the Schick patent seems to me entitled to a considerably broader range of equivalents than the majority of the court would allow. The opinion concedes that Schick's patent is valid and that his invention was a great improvement over Appleyard. If this be so, I cannot believe that the interposition of a long slot which crosses the transverse slots of Schick prevents defendant's Packard razor from falling within the claims. The two devices operate in substantially the same way, and the long slots which only slightly interrupt the continuity of the Schick cutting members are at best no more than slight improvements over the earlier razor. Appleyard does not to my mind suggest the Packard razor or limit the claims in issue. If this be so, the decree of the District Court should be affirmed and claims 1 and 3, supra, held infringed. With all respect such seems to me the proper disposition of the cause of action involving United States patent No. 1,721,530.