Abraham Tulin and Reginald Hicks, both of New York City, for plaintiffs.

Pennie, Davis, Marvin & Edmonds, of New York City (George E. Middleton and H. Stanley Mansfield, both of New York City, of counsel), for defendants.

**SCHICK DRY SHAVER, Inc., et al. v. R. H. MACY & CO., Inc., et al.**

**SAME v. SEARS, ROEBUCK & CO. et al.**

District Court, S. D. New York.

May 26, 1939.

GODDARD, District Judge.

One of these suits was brought by the plaintiffs against R. H. Macy & Co., Inc.; the other against Sears, Roebuck & Company, both of which were selling dry shavers made by the Utility Instrument Company, which company has intervened in both cases with the consent of the plaintiffs. The suits are for infringement of patents for dry shavers. The same patents are alleged to be infringed in the two suits. Macy sells the device manufactured by the Utility Instrument Company under the name "Saybrooke Electric Razor", and Sears, Roebuck & Company sells the same device under the name "Champion Electric Shaver". The Utility Instrument Company, the manufacturer of all of them, markets them itself under the name "Utility Electric Razor"; Macy sold three models of the shaver referred to during the trial as Exhibits 8, 11 and 15; Sears, Roebuck & Company has sold only two of these models, Exhibits 11 and 15.

It is conceded that the plaintiff, Schick Industries, Limited, is the owner of the three patents in suit and that the plaintiff, Schick Dry Shaver, Inc., is the exclusive licensee for the patents in the United States. It is also conceded that the manufacture and sale of the dry shavers by the defendant, Utility Instrument Company, which the plaintiffs complain of, the alleged sale of the dry shavers by R. H. Macy & Co., Inc., and by Sears, Roebuck & Company, occurred within the Southern District of New York.

The subject of the patents sued upon is a mechanical shaving device with which

hair upon the face or other parts of the body can be shaved off at the surface of the skin. The hair is removed without the application of lather or cream, so that it is a "dry shaver".

Although there had been some ineffectual efforts to invent a dry shaving implement, it was not until 1930 when Schick produced his dry shaver, the subject of the patents in issue, that anyone, anywhere had ever made or sold an actual dry shaver so far as is known; that Schick had invented a dry shaver which would satisfactorily shave a person. That the public were waiting for a dry shaver that would satisfactorily shave a .person, and that Schick seems to have succeeded in producing such a shaver is evidenced by the great number of people who are using them since 1930 or 1931, when it first appeared on the market. Upwards of 2,500,000 have been sold at prices ranging from twenty five to fifteen dollars apiece,

The three patents in suit and the claims of each patent in issue are—

"1. No. 1,721,530, issued July 23, 1929, on an application filed March 31, 1928; of which claims 9, 13, 14, 15, 16, 17, 19, and 20 are charged to be infringed by the first and second models of the defendants' devices. All these claims, excepting the last two, namely, 19 and 20, are likewise charged to be infringed by the third model as well.

"2. No. 1,757,978, issued May 13, 1930, on an application filed April 23, 1928; of which claim 1 is charged to be infringed by all the models in suit.

"3. No. 1,747,031, issued February 11, 1930, on an application filed July 2, 1928; of which claim 1 is charged to be infringed by all three models."

The defendants have interposed the defenses of invalidity and non-infringement.

Patent No. 1,721,530 relates particularly to the head of the shaving device which, speaking generally, includes a uniformly thin shear plate to rest against the skin with openings in it and having walls adjoining the sides of the plate; a movable cutter inside the walls operating underneath the shear plate by a shearing action which takes place on, or practically on, the surface of the skin, with means for supporting the thin shear plate against the external pressure in shaving and any inward flexing by means of the cutter to whatever extent the thinness of the shear plate may require; also means for operating the cutter in co-operation with the cutting or inside edges of the openings in the shear plate. The shear plate is sufficiently thin to provide a close shave, the width of the openings in it being so proportioned to the thinness of the plate that when the plate is used against the skin, the skin forms a cushion or enters into the openings so that the shearing or cutting edges, which are on the inner side of the shear plate, are about flush with the surface of the skin. But the shearing or cutting edges are too close together to permit the skin to enter up into or beyond the slots or spaces between them on the inside surface of the plate, so that while the hairs are thus cut practically at the surface of the skin, the skin is safe from being cut. No moving part touches the skin.

The first model of the defendants' shaver (Exhibit 8) appeared on the market in March, 1937, and has two entirely separate and independent shearing assemblies ranged alongside of each other, separated on the side which comes in contact with the skin by a space or trough, the trough serving no shearing function. The metal of the trough unites them so that they may be operated by the same motive power, and both shear simultaneously throughout the two shearing surfaces. In construction it resembles twin Schick shearing members placed alongside of each other with a space between. Both of its two shearing heads have an extremely thin shear plate to rest against the skin and closely spaced narrow parallel slots extending across the shaving head from side to side and open at both ends. The walls of the slots are open at both ends and slant towards each other and tend to converge above the inner surface of the shear plate. The inner and the outer supporting walls of the twin shear plates are also slotted opposite the slots of the shear plates so that hair may enter into the slots without matting down. Beneath each of the shear plates and enclosed within it and the side walls which support the shear plate, there is a cutter with teeth to engage the blades to provide a shear cut and having flat ends to support the blades and hold them in position; the teeth of the cutter being wider than the space between the blades of the shear plate. Means are provided for reciprocating the cutter along and trans-

versely of the blades. Beneath the two cutters are two springs which exert an upward force which tend to hold the lightly constructed cutters in close contact with the inner surfaces of the twin shear plates.

The second model of the defendants' shaver (Exhibit 11) is constructed and operates like its first model except that (1) its twin shear plate blades appear to have a taper over their shearing lengths from .009 of an inch at the inner ends of the shearing lengths down to .0055 of an inch at the outer ends. But this apparently greater thickness of the blades at these points is practically off-set by the fact that the metal on both sides of the slots toward their inner shearing lengths is progressively more and more bevelled out on the skin contacting sides of the blades, resulting in the blades being in effect the same thickness as they are at the outmost points. So that for practical shaving purposes these blades are of uniform thickness throughout their length. (2) The other difference between defendants' first and their second model is that the grooves cut through the inner side walls of the shear plates opposite or as continuations of the slots are not deep in the second model but this seems to be of little importance as they are of sufficient depth to perform a like function.

Defendants' third model (Exhibit 15) differs from their first model in having its shear plate blades thicker by one or two thousandth of an inch and they taper from about .008 of an inch in thickness down to .007 over the outward extent of their shearing lengths, and its slots have perpendicular side walls; also its slots do not continue through the inner side walls, although extending clear through the outer side walls.

### Patent No. 1,721,530

Claim 9 reads: "A shaving implement comprising a holder having a series of blades at its end, the blades being so thin that they need support in shaving, a cutter with teeth to engage the blades to provide a shear cut and having flat ends to support the blades and hold them in position, and means for moving the cutter along the blades, the teeth being wider than the space between the blades."

All three of the defendants' models have thin blades. Each of them has a cutter with teeth to engage the blades to provide a shear cut and have flat ends to fit closely against the shear plate, means for moving the cutter along the blades, the teeth being wider than the space between the blades.

The consequences of a substantial amount of flexing in the shear plate would tend to cause the shearing edges of the inner cutter to collide with the shearing edges of the depressed shear plate blades wearing the edges of both and dulling them. Furthermore, the inner cutter would be pushed out of contact with the blades of the shear plate, which were not depressed, and as a result there would be spaces where the hair entering the slots was not shaved off clear but would be wedged in between the inner cutter and the shear plate and cause pulling of the hair.

The defendants' device has two springs which keep the inner cutter in contact with the shear plate. These springs exert a force of one pound ten ounces and the inner cutter weighs but one sixteenth of an ounce. The plaintiffs urge that these springs, besides serving the purpose of keeping the inner cutter in contact with the shear plate, serve to prevent the flexure of the shear plate blades; that springs exerting a force of one ounce would be ample to keep the inner cutter in contact with the shear plate; that the reason for the additional force in the springs is to prevent the thin shear plate from flexing.

Two experienced mechanical engineers have testified. Professor Maxstadt, called by the plaintiffs, and Dr. Free, called by the defendants, the one stating that in his opinion the springs served not only to hold the inner cutter in contact with the shear plate, but also to prevent the blades on the shear plate from flexing; the other stating that the sole use of the springs was to keep the inner cutter in contact with the shear plate, and that applying a pressure of one pound upon the blades of the defendants' device, which is more than would be used in shaving, there was the microscopic deflection of four ten thousandths (.0004) of an inch, and as the average diameter of a hair is but five one thousandths (.005) of an inch, this amounts to a deflection of equal to eight (8) per cent of the diameter of a hair and that such a deflection is inconsequential and that there is no need for the springs to exert any force to off-set the possible very slight flexing of the blades, and that

a careful test under a one pound pressure showed that the shear plates deflected to substantially the same extent with the inner cutter removed as with it in place.

There is also reliable testimony that the defendants' models were used with a shaving pressure of three and a half pounds and that there was no interference with the operation of the shaver, and that with a greater pressure than that the friction between the skin and the face plate is so great that it is impossible to move it across the skin. Such a pressure is far beyond the counter balance of the inward force of the springs.

The plaintiffs' contention is that the outward thrust of defendants' springs counterbalances the inward thrust of the shaving pressure. But the outward thrust of defendants' springs is constant while the shaving pressure varies, and with any shaving pressure of more than thirteen ounces, defendants' springs would be ineffective; and it would seem that if the shear plate is so thin as to flex and to require support, only a rigid support such as Schick shows in his patent would serve effectively against varying pressures.

I am not convinced that the shear plate blades of the defendants' shaver are so thin that they need support in shaving, nor that its inner cutter furnishes this support. I think the sole use and need of the springs in defendants' shaver is to keep the inner cutter in firm contact with the shear plate.

Assuming, for present purposes without deciding, that claim 9 is valid, for the Circuit Court held claim 1 valid and that is a broader claim than claim 9, I do not think that any of the defendants' three models (Exhibits 8, 11 and 15) infringe.

Claims 13, 16 and 19, while differing from each other in some important details, have certain basic features in common, and may be considered together. They read:

"13. A shaving implement comprising a shear-plate with slots extending from side to side, a cutter under the plate and having teeth to co-operate with the edges of the slots in cutting, and means for operating the cutter transversely of the slots."

"16. A shaving implement comprising, in combination, a shear-plate having a series of closely spaced blades adapted to lie in contact with the skin and whose shearing edges are disposed in a direction substantially continuous with the direction of manipulation of the implement during a shaving operation, the blades of the shear-plate being relatively thin and of substantially the same cross-sectional area along their shearing lengths, cutter means having teeth bearing against the rear faces of the blades of the shear-plate and forming shearing edges co-operative with the shearing edges of said blades, and means to translate said cutter means in a direction lateral to the blades."

"19. A shaving implement comprising, in combination, a rectangular shear-plate having alternate blades and slots across its narrow dimension and walls bordering its longest dimension, said shear-plate constituting a relatively narrow skin contacting area, said slots being open-ended and extending from side to side of said shear-plate, cutter means disposed rearward of said shear-plate and intermediate said walls, said cutter means having teeth contacting said blades, and means for translating said teeth over the rear surface of said blades whereby hair engaged by said teeth and blades is severed."

In Schick Dry Shaver, Inc., et al. v. Dictograph Products Co., Inc., 2 Cir., 89 F.2d 643, 645, claim 1, relating particularly to the shear plate of extreme thinness, and claim 13, the outstanding characteristic of which is that it calls for a shear plate "with slots extending from side to side" which is an important feature of plaintiffs' shaver, were held to be valid but not infringed by the Dictograph "Packard" shaver. Claim 1 is not involved in the case at bar. The Circuit Court said that the Schick invention was a great improvement over Appleyard's device, and that " * * * it is enough on validity if Schick * * * made one or more patentable improvements which he disclosed and covered in his claims in suit. We think he did just that at least in (1) providing the shear plate throughout of extreme thinness; having (2) slots extending all the way across from edge to edge; and (3) a cutter bar supporting the shear plate, throughout its entire width, against flexing."

It held claim 13 to be "allowable over Appleyard in that it was tied to 'a shear plate with slots extending from side to side' of the plate. This was the new feature that brought about end cutting that was wholly absent in Appleyard", and went on to say: "But as validity of these claims is dependent upon the rather slight amount

of their departure from what Appleyard disclosed so must infringement be proved, if proved at all, within such narrow limits."

The question therefore now before this court is—whether these defendants' devices infringe within the narrow limits proscribed by the Circuit Court, which limitations, of course, are controlling upon this Court? The Circuit Court found that the Packard shaver was not based on Schick but was an "ingenious adaptation of Appleyard * * * hardly more than the result of turning Appleyard's cutting edges in upon themselves so that they face each other across the endwise slot". But in the case at bar the defendants have followed Schick's idea to some extent, at least, and their shavers have no transverse slot and need none. The cross slots extend all or practically across the shear head from edge to edge, and these slots in the thin shear head are so made as to allow the skin to extend up into these slots to the nether side of the shear plate. The advantages of Schick's idea of a uniformly thin shear plate with slots extending from side to side in the shear plate are that shaving may take place over the entire area of the shear plate and not merely along the edges of the shear plate as is the case with ordinary clippers or with Appleyard's device, and the danger of the skin entering the transverse slot and being injured by the cutting edges is eliminated.

The Circuit Court found that the Packard shaver has no uniformly thin shear plate and did not have slots extending from side to side in the shear plate, and said of the Packard shaver that "the lack of such distinguishing slots stands between the defendant's shaver and infringement of that claim [claim 13]."

Appleyard's device was not a practical shaver; it never went into general use because even if one might get a satisfactory shave with it, which seems very doubtful, the skin was likely to be cut by the sharp points of the cutter. Schick made a great advance and produced a practical shaver. He did away with the exposed cutting edges and used a uniformly thin shear plate with slots extending across from edge to edge, with an inner cutter supporting the thin shear plate from flexing.

The Circuit Court has not limited the scope of Schick's claim so as to deprive him of the exclusive right to this special feature of his invention—slots extending all the way across from edge to edge. As

has been noted, the special feature of claim 13 is that it provides for a shear plate with slots extending from side to side, while claim 19 calls for a shear plate with not only slots extending from side to side, but for slots which shall also be open-ended. The special feature of claim 16 is that it calls for the blades of its shear plate to be "of substantially the same cross-sectional area along their shearing lengths". Both plaintiffs' Exhibits 8 and 11, which are the first two of defendants' models, have slots extending from side to side and they are open-ended on both sides. In each of them the blades are practically the same cross-sectional area throughout their shearing lengths. Plaintiffs' Exhibit 15, the defendants' third model, also has slots extending from side to side of the shear plate, such as called for in claim 13, and it has blades of "substantially the same cross-sectional area along their shearing lengths" as required in claim 16. But defendants' third model does not have the open-ended slots called for in claim 19. It is true that Exhibit 15 has an extremely small outward taper in its blades, but as Judge McCormick said in the Motoshaver and Nicholl cases, such a variation was "of no material consequence in the construction, mode of operation, or utility of the device". I think that it is clear that defendants' third model, Exhibit 15, does not infringe claim 19, but that it does infringe claims 13 and 16 and that defendants' first and second models, Exhibits 8 and 11, infringe all three of these claims, which are valid.

In addition to the patent to Drosse later referred to, defendants cite, as anticipating the patents in suit, Appleyard British Patent No. 753 of 1913, which, it seems to me, has been disposed of by the Circuit Court of Appeals in the decision in the Dictograph case already discussed; also the French patent to Fourniols, No. 613,873; the Swiss patent to Werner, No. 73,939, neither of which, nor any of the others cited by defendants, in my judgment, anticipate or limit the claims in suit.

Claims 14, 15, 17 and 20 also may be considered together for, although they differ from each other in some important details, they have certain basic features in common. They read:

"14. A shaving implement comprising, in combination, a series of thin and narrow blades having outer surfaces adapted to lie against the surface of the skin while shav-

ing, said blades being separated by slots of such width as to permit at least one hair to enter, said width being so proportioned in respect to the thin and narrow dimensions of said blades as to prevent the surface of the skin being shaved from extending above the rear surfaces of the blades when the blades contact the surface of the skin during a shaving operation, cutter means having shearing edges in contact with the rear surfaces of the blades, and means for operating said cutter means in relation to the blades.

"15. A shaving implement comprising, in combination, a series of closely spaced blades whose outer surfaces are applied to the skin during a shaving operation and whose rear surfaces have edges against which hair is cut close to the surface of the skin, the blades being spaced sufficiently to permit hair to enter therebetween but to exclude the passage of skin above the rear surfaces of the blades when the outer surfaces of the blades are applied to the skin and drawn thereover in a direction substantially continuous with the edges of the blades, cutter means having teeth bearing against the rear surfaces of the blades, and means to translate said cutter means whereby the shearing of hair between the blades and teeth is attained."

"17. A shaving implement comprising, in combination, a shear-plate having a series of parallel spaced blades separated by slots open-ended on at least one side of the shear-plate, said slots being of such a width as to accommodate hair and to maintain the surface of the skin being shaved from extending above the rear surfaces of said blades while permitting it to extend substantially to said rear surfaces along the lengths of said slots as the outer surface of the shear-plate is held flat against the skin, cutter means having edges contacting the rear surface of the shear-plate, and means to operate said cutter means in relation to the shear plate."

"20. In a shaving implement, a thin shear-plate of uniform thickness having a series of alternate slots and blades, the walls of each of the slots being inclined toward each other and approaching a line of convergence above the rear surface of said shear-plate, and the slots being of sufficient width to accommodate at least one hair in erectile position and to exclude the extension of the surface of the skin above the rear surface of the shear-plate when the outer surface of the shear-plate is placed against the surface of the skin to be shaved."

Comparing these claims, it will be observed that each of them includes the provision that the slots of the shear plate shall be wide enough to permit at least one hair to enter the slot and having the width of the slot so spaced or proportioned in respect to the thin and narrow dimensions of the blades as to prevent the surface of the skin being shaved from extending up into the slots beyond the rear surfaces of the blades. Schick's formula called for slots so proportioned to the dimensions of the blades that when the shear plate is placed against the skin and a normal amount of pressure is applied, depending upon the toughness or texture of the user's skin, the skin will enter into the slots to the extent that it is on the level with the rear surfaces of the shear plate, but is prevented from extending beyond the rear surfaces, with the result that the hair is shaved off at the surface of the skin and the danger of cutting the skin is eliminated.

■ Defendants take the position that these claims are invalid because the patent does not specify the width of the slots and the thickness of the shear plate. But this absence of specific dimensions is not fatal to the claims for using Schick's formula. One skilled in the art would have little difficulty in following the formula in actual practice as is evidenced by the defendants' factory superintendent, who found no difficulty in producing shear plates thus described. What was said in A. B. Dick Co. v. Barnett, 2 Cir., 288 F. 799, at page 801, is in point: "It is not possible to formulate a rule in this matter, though it may be safely said that it is by no means enough to condemn a patent disclosure that even a skilled man might find it necessary to make several tests or trials of before arriving at success." See also Smith v. Snow, 294 U. S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Minerals Separation, Ltd., v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286; Vacuum Cleaner Co. v. Innovation Electric Co., 2 Cir., 239 F. 543.

The defendants cite patent No. 664,388, issued to Hermann Drosse, December 23, 1900, as anticipating these claims. But Drosse's device was so constructed that skin should pass *entirely* through a single wide opening and be scraped by a revolving cutter. This differs fundamentally from Schick's idea that the opening or slot, which shall be of such width as to *prevent*

the skin from *protruding* from the slots and being scraped or cut by the inner cutter.

All three of the defendants' models have adopted Schick's formula for the proper proportion between the width of the slot and the thickness of shear plate and also have all the elements of construction called for in claims 14, 15 and 17. The first two of the defendants' models include the features of claim 20, as both shear plates are of uniform thickness (although appearing to taper, are progressively bevelled so that they are in effect of the same thickness) and have slots with walls inclined toward each other and approach a line of convergence above the rear surface of the shear plate. Defendants' third model does not have these elements, and is not charged with infringing this claim 20. Defendants' first two models, Exhibits 8 and 11, do infringe all four of these claims, which I find are valid, namely—14, 15, 17 and 20, and its third model, Exhibit 15, infringes claims 14, 15 and 17.

Patent No. 1,757,978 was co-pending in the Patent Office together with Patent No. 1,721,530 and discloses certain additions and improvements to the shaver described in Patent No. 1,721,530 in combination with all the other elements of it. Claim 1 of Patent No. 1,757,978, which is charged by plaintiff to be infringed by all of defendants' models in suit, reads:

"1. A shaving machine comprising, in combination, a skin contacting plate of narrow width with alternate slots and blades extending widthwise of the plate, the plate being of thin metal, walls supporting the skin contacting plate at the ends of the blades, said walls having openings opposite the slots whereby hair may enter said slots without substantial bending of the hair at the surface of the skin as the shaving implement is passed over the skin in a direction substantially parallel to the slots, cutter means including a plate in contact with the rear surface of the skin contacting plate and having alternate slots and teeth whereby hair in the slots is sheared as said cutter means is translated, and means to translate said cutter means."

■ The special feature of this claim is that the side or supporting walls of the ' shear plate have openings opposite the slots of the shear plate, through which hair may enter the slots without substantial bending of the hair at the surface of the skin. Defendants contend that this claim is invalid because of a failure to comply with the requirements of section 4892, 35 U.S.C.A. § 35, in filing a supplemental oath after an amendment was filed which included this claim. But the specifications and drawings of the patent as filed, sufficiently disclose the structure claimed in this claim. Figure 3 of the drawings plainly shows this side wall feature of claim and the specification clearly states how this feature is to be incorporated in the structure. The claim was fairly derivable from a former sworn disclosure. This seems to render it unnecessary for the patentee to file a supplemental oath when claim 1, which claims this feature, was later interposed. Bickell v. Smith-Hamburg-Scott Welding Co. of New York et al., 2 Cir., 53 F.2d 356, at page 358; Scovill Mfg. Co. v. Radio Corporation of America, D.C., 9 F.Supp. 239.

■ Defendants' first model, Exhibit 8, follows and infringes this claim. Its second and third models, Exhibits 11 and 13, also have walls supporting each of the skin contacting plates at the end of the blades, but only the outside one has openings opposite the slots of the shear plate, such as are described in this claim. The inside walls do not have such slots. The defendants use plaintiffs' invention disclosed in the claim, but apparently merely in their attempt to escape infringement use it only on one side of the shear plate. I can see no other reason for not doing so for it is not as efficient. The defendants practice the invention but imperfectly. As stated by Judge Learned Hand in Van Kannel Revolving Door v. Straus, et al., 2 Cir., 235 F. 135, at page 137: "* * * it has used the idea in the invention, but has incorporated it in an imperfect form, a subterfuge which the courts will not pass." See also Standard Brands, Inc., v. Federal Yeast Corporation, D.C., 38 F.2d 314; Id., D.C., 38 F.2d 329.

I find that all three of the defendants' models in suit infringe this claim.

In Schick Dry Shaver, Inc., et al. v. Motoshaver, Inc., et al., D.C., 25 F.Supp. 346, it was held that the second model of the Dual-Head Motoshaver, which in this respect was like the second and third models (Exhibits 11 and 15) of these defendants, infringed this claim and that the claim was valid.

Patent No. 1,747,031 is for an improvement to the shaver described in Patent 1,721,530 and Patent No. 1,757,978, and

the new feature, according to the patentee, "is a series of minute openings between parallel teeth that are thin, the teeth having shoes or projections on the end to pick up hairs that lie close to the skin and direct them into the slots as the machine is passed over the face" in a direction parallel with the teeth. Claim 1, the only claim of this patent charged to be infringed, reads: "1. A shaving machine having a hollow and piece with a series of teeth on one face, the teeth having small slots between them, pointed shoes on the ends of the teeth and cutter teeth in the hollow end piece passing under the first teeth to sever hair passing through the slots".

The pointed shoes on the end of the shear plate blades as shown in the drawings of this patent, are little pointed projections "J" shaped like the cow catcher of a locomotive that extend outward from each side wall and guide the hairs into the slots. The defendants' shear plates do not have such pointed shoes, although the outer ends of the teeth on defendants' shaver are bevelled to guide the hairs into the slots.

In view of the old custom of bevelling the teeth of hair clippers to guide the hair into the slots and the specification in Appleyard that "the surfaces of the comb teeth that come in contact with the skin may be notched or serrated to direct the hair between the teeth of the comb" this claim is a limited one. Moreover, this claim provides for a shaving machine having a "hollow end piece". Defendants' shaver has no hollow end piece. The defendants' teeth with mere bevelled edges do not perform the same function in the same way. Plaintiffs' cow catcher shoe tends to pick up as well as to guide the hairs into the slots.

This claim is not infringed by any of defendants' shavers in suit.

In addition to the decision of the Circuit Court of Appeals of this Circuit in the Dictograph case, previously referred to, holding claim 13 of Patent No. 1,721,-530 valid, claims 13, 14, 15, 16, 17 and 19 of this patent, and claim 1, of Patent No. 1,757,978 were held to be valid and infringed in Schick Dry Shaver, Inc., et al. v. Motoshaver, Inc., et al., D.C., 21 F.Supp. 722, affirmed, 9 Cir., 100 F.2d 236; Id., D. C., 25 F.Supp. 346, on final hearing; Schick Dry Shaver, Inc., et al. v. Nicholl, Inc., 39 U.S.P.Q. 373.

Accordingly, I find:

 In respect to Patent No. 1,721,530 claim 9 is not infringed by any of the defendants' three models; claims 13, 16 and 19 are valid and infringed by defendants' first and second models, and that claims 13 and 16 are infringed by defendants' third model; claims 14, 15, 17 and 20 are valid and are infringed by the defendants' first and second models, and that claims 14, 15 and 17 are infringed by its third model.

Patent No. 1,757,978, claim 1, is valid and infringed by all three of the defendants' models.

Patent No. 1,747,031 is not infringed by any of defendants' models in suit.

A decree in accordance with the above may be entered upon the usual notice.

The plaintiffs may submit proposed findings in respect to Patent No. 1,721,530, claims 13, 14, 15, 16, 17, 19 and 20, and Patent No. 1,757,978, claim 1; and the defendants may submit proposed findings in respect to Patent No. 1,721,530, claim 9, and Patent No. 1,747,031, claim 1. Both upon five days notice.